# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-1345

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANTONIO SHERROD,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 04 CR 20001—**Michael P. McCuskey**, *Chief Judge.*

ARGUED FEBRUARY 13, 2006—DECIDED APRIL 27, 2006

Before KANNE, EVANS, and WILLIAMS, *Circuit Judges.*

EVANS, *Circuit Judge.* The utter senselessness of the crime in this case is shocking. It played out over a matter of moments, and was captured on a surveillance camera, at an Amoco gas station/convenience store in Kankakee, Illinois. We recount just a snippet of the facts.

Around midnight on a March evening in 2003, 24-year-old Stephen Prendergast was driving his girlfriend, Regan Booker, from Matteson, just south of Chicago, to Champaign, where she attended college. Two girls, Regan's sister Loren and Tiffany Sanders, both also students at the college, were also traveling to Champaign with Prendergast and Regan, but they were in a separate car.

Prendergast was driving a flashy 2003 Cadillac Escalade.[1] They stopped at the Amoco station as Prendergast pulled the Escalade up to a pump. He got out of the car and entered the convenience store. When he returned and was about to enter his car, he was met by a man who turned out to be Antonio Sherrod. Sherrod confronted Prendergast, demanded his car keys, and shot him at point-blank range with a 9 mm handgun. Ms. Booker ran from the Escalade as Sherrod commandeered it and drove off. Prendergast died a short time later of a bullet wound to his heart.

A federal jury convicted Sherrod on several counts: carjacking with intent to cause death and serious bodily harm, 18 U.S.C. § 2119(3), using a firearm to commit a crime of violence, 18 U.S.C. § 924(c), and possessing a firearm as a convicted felon, 18 U.S.C. § 922(g)(1). Sherrod received two consecutive life sentences plus 10 years concurrent. On appeal, he challenges: (1) the jurisdictional basis of his carjacking conviction; (2) the admission at trial of statements he made following his arrest; and (3) the determination of his sentence.

Carjacking with intent to kill or maim is a federal crime if the vehicle "has been transported, shipped, or received in interstate or foreign commerce." 18 U.S.C. § 2119. The government therefore had to show that Prendergast's Escalade at some point crossed the border into Illinois—which shouldn't be too difficult, given that Escalades aren't manufactured in Illinois. Where, as here, the connection to interstate commerce is all but self-evi-

---

[1] It's certainly a dubious distinction, but Escalades are the favorite target of thieves and carjackers. As reported (in October 2004) by the Institute for Highway Safety, Escalades have the highest theft-claim rate among newer vehicles. This is so because they have expensive parts and a certain cachet due to their exposure from celebrity ownership.

dent, the jurisdictional element is typically stipulated to. But for some reason, that didn't happen in this case. Instead, the government offered the testimony from Lt. Patrick Kane, the Kankakee police officer in charge of the investigation, to establish the vehicle's origin:

> AUSA: [I]s there a database maintained by the Secretary of State that could—that can advise a police officer of the origin of a vehicle based on its VIN, or vehicle identification number?
>
> KANE: There is a database. However, I don't know if that's the Secretary of State's database or who actually maintains that. I know it's a state agency, but it may not be the SOS office.
>
> AUSA: Did you conduct an inquiry based on the VIN of the Cadillac Escalade with the state agency to determine its origin?
>
> KANE: I had that done, yes.
>
> AUSA: And what were the results of that?
>
> KANE: The vehicle was made in Arlington, Texas.

Sherrod now argues that this testimony should have been excluded as hearsay, given that Lt. Kane apparently did not conduct the inquiry himself but rather "had [it] done" by someone else. Without Kane's testimony, the argument goes, there was no evidence at all that the Escalade came from outside of Illinois, and thus no basis for federal jurisdiction. And although it's common knowledge that Escalades aren't made in Illinois, Sherrod insists that the government still must meet its burden of proof. *See United States v. Burton*, 324 F.3d 768, 770 (5th Cir. 2003) (reversing federal carjacking conviction where government offered no evidence of interstate transport, rejecting argument that it was within the jury's common knowledge that the particular vehicle model was not manufactured in-state).

The main problem Sherrod faces in making this argument is that he didn't object to the admission of Kane's testimony during the trial, so our review is only for plain error. For Sherrod to prevail under that standard, the error must seriously affect the fairness, integrity or public reputation of the judicial proceedings. *See United States v. Atkinson*, 297 U.S. 157, 160 (1936); *United States v. Gray*, 410 F.3d 338, 345 (7th Cir. 2005). It doesn't in this case. If Sherrod had objected that the lieutenant's testimony was hearsay, the government could easily have found additional ways to show that the Escalade came from outside of Illinois. In the absence of an objection, the government's reliance on Kane's testimony—concerning a fact which is, after all, usually undisputed and undeniable—that Escalades are in fact not made in Illinois, does not amount to a miscarriage of justice.

Next, Sherrod argues that in the interview immediately following his arrest the Kankakee police failed to honor his invocation of the right to remain silent and that the district court should therefore have suppressed the incriminating statements he made during that interview. During the interview, Sherrod asked Lt. Kane what he was charged with, but Kane insisted that they finish reviewing the written *Miranda* warnings before proceeding with the interview. Taking a defiant stance, Sherrod told Kane, "I'm not going to talk about nothin'," and, reemphasizing the point, "I'm not gonna talk about nothin'—if you'd give me a picture of what's going on, but I ain't gonna talk about shit." After they completed the *Miranda* warnings, Kane informed Sherrod of the charges against him and Sherrod executed a written waiver of rights. The interview continued for about 10 minutes and was terminated when Sherrod requested a lawyer. During the 10 minutes, Sherrod said, among other things, (1) "I'll bet the video don't show my real face, do it?"; (2) the woman in the front seat "can't identify me"; and (3) you "can't trust those whores at the gas station." He also

denied that his fingerprints would be found on the gun or in the Escalade. They were.

After a hearing on Sherrod's motion to suppress, the district court (Judge Michael P. McCuskey) concluded that Sherrod did not unambiguously invoke his right to remain silent when he said that he was "not going to talk about nothin'." Noting that an ambiguous invocation of the right to remain silent does not require that the police cease all questioning, *see United States v. Banks*, 78 F.3d 1190, 1197-98 (7th Cir.), *vacated on other grounds by Mills v. United States*, 519 U.S. 990 (1996), the court denied Sherrod's motion. Sherrod argues that his statements can only have meant one thing: he wanted the interview to end. But we agree with the district court. A suspect telling a police officer that he's "not going to talk about nothin'" is as much a taunt—even a provocation—as it is an invocation of the right to remain silent. When Sherrod wanted to end the interview, he knew how to do it unambiguously. He didn't do so before he uttered his statements.

Finally, Sherrod presents two challenges to his sentence. He first argues that the district court erred in calculating his advisory guideline range (this was post-*Booker*) for his carjacking conviction. The relevant guideline, § 2B3.1(c), directs the court to apply the guideline for first degree murder, § 2A1.1, if a victim was killed during the offense under circumstances that would constitute murder under federal law. Sherrod argues that this cross-reference was impermissibly applied because the jury did not find him guilty of murder. He's right that the jury did not find him guilty of murder—rather, it found him guilty of carjacking with intent to cause death and serious bodily harm, which, if death results (as the jury explicitly found), carries a penalty of "any number of years up to life," 18 U.S.C. § 2119(3). The court then properly carried out its responsibility under *United States v. Booker*, 543 U.S. 220 (2005) to determine, based on a preponderance of the

evidence, the facts relevant to an advisory guideline range, such as whether the killing of Stephen Prendergast would have been murder under federal law. That's how it's supposed to be done—there was no error.

Sherrod also argues that the district court wrongly concluded that it was required to impose his two life sentences consecutively, based on its interpretation of 18 U.S.C. § 924(c)(1)(D)(2). Not only is it unclear how Sherrod would benefit if the court were allowed to consider imposing his two life sentences concurrently instead, but we have already rejected an essentially identical argument in *United States v. Sutton*, 337 F.3d 792, 802 (7th Cir. 2003), and find no reason to conclude differently here.

The judgment of the district court is AFFIRMED.

A true Copy:

       Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
