Deandre Ricardo Williams v. State of Maryland, No. 9, Sept. Term, 2015 Opinion by Battaglia, J.

**CONSTITUTIONAL CRIMINAL PROCEDURE – FIFTH AMENDMENT – RIGHT TO REMAIN SILENT – INVOCATION**
During a custodial interrogation, a suspect's statement "I don't want to say nothing. I don't know" was an ambiguous statement such that a reasonable police officer in the circumstances would not have understood him to be invoking his right to remain silent.

**CRIMINAL LAW – MARYLAND COMMON LAW - CONFESSION – IMPROPER PROMISES OR INDUCEMENTS**
Presenting a suspect with two characterizations of a homicide and advising the suspect of the possible consequences of a verdict of first degree murder is not an improper inducement.

Circuit Court for Prince George's
County, Maryland
Case No. CT110710X
Argued: October 6, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 9

September Term, 2015

DEANDRE RICARDO WILLIAMS

v.

STATE OF MARYLAND

Barbera, C.J.
Battaglia
Greene
Adkins
McDonald
Watts
Harrell, Jr., Glenn T.
(Retired, Specially
Assigned)

JJ.

Opinion by Battaglia, J.
Barbera, C.J., Adkins and McDonald, JJ.,
dissent.

Filed: December 18, 2015

Was Petitioner Deandre Ricardo Williams's statement that "I don't want to say nothing. I don't know" an ambiguous or clear invocation of his right to remain silent under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)? Whether Williams's confession, given after waiving his *Miranda* rights, was voluntary or the product of inducement, poses another conundrum.

Specifically, the questions before us are the following:

1. Did police violate Petitioner's right to remain silent during a custodial interrogation when he said "I don't want to say nothing. I don't know, -" to which the police responded "But you don't have to say nothing" but continued with the interrogation?

2. Did the police interrupting Petitioner while he invoked his right to remain silent convert an unambiguous invocation into an ambiguous invocation?

3. Was Petitioner's confession involuntary under Maryland common law because the police implied that Petitioner might see outside again if he confessed to a robbery gone bad instead of a premeditated murder?

The State filed a Conditional Cross-Petition for Writ of Certiorari, which we also granted, but do not reach.[1]

---

[1] The State's conditional cross-petition posed the following question:

Where the officers were still in the process of explaining Williams's rights to him, and had not yet said or done anything that would have been reasonably likely to elicit an incriminating response from Williams, did the Court of Special Appeals err in ruling that Williams was being interrogated for purposes of *Miranda*?

We shall hold that Williams's invocation of his right to remain silent by saying "I don't want to say nothing. I don't know" was ambiguous and that his confession was voluntary.

Williams was indicted in the Circuit Court for Prince George's County for first degree murder, second degree murder, first degree assault, use of a handgun in the commission of a crime of violence, second degree assault, reckless endangerment and carrying a handgun. The charges arose from the shooting death of Justin DeSha-Overcash on January 10, 2011 in College Park. Ultimately, Williams was convicted and sentenced to life in prison, with all but 49 years suspended for first degree murder, as well as a concurrent 20 years sentence for the use of the handgun in the commission of a crime of violence.

Prior to trial, Williams moved for the suppression of a confession he had given to a Detective Harris and Sergeant Gregory McDonald of the Prince George's County Police. Detective Harris and Sergeant McDonald had interviewed Williams in an interrogation room in the District of Columbia; the interview was digitally recorded, then later copied to a DVD and transcribed.

The video and the transcript reflect Detective Harris and Sergeant McDonald asking whether Williams wanted to speak with them and noting several times that he did not have to talk:

> [DETECTIVE HARRIS]: (Inaudible). Heard you was fast as lightening. Lightening. Okay. The reason why me and Sergeant McDonald are here, we are investigating an incident that happened in January. We been working nonstop on it. Through our investigation your name came up, okay?

[WILLIAMS]: Uh-huh.

[DETECTIVE HARRIS]: Now, what we have now are what other people have been saying about it. It was enough for us to get an arrest warrant for you, okay? What we'd like to do is give you an opportunity to answer any questions that we may have, or ask us any questions that you have about the incident. We want to ask you questions. You can stop answering at any time. You don't have to talk to us. We want you to talk to us, to be honest with you. Like I say, it's your prerogative. Like I said, you can talk to us about anything. If you are wondering what we may have to say, this is your opportunity to say, okay.

[WILLIAMS]: What's the incident?

[DETECTIVE HARRIS]: Huh?

[WILLIAMS]: I said what's the incident?

[DETECTIVE HARRIS]: What's the answer to what?

[WILLIAMS]: I said what's the incident?

[DETECTIVE HARRIS]: Well, we'll get into it after I, if you want to know about it, if you want to know what we're talking about, I'm going to have to read you your rights. You have the right to talk to us, you have the right not to talk to us. You have the right to talk to us and stop talking at any time. You understand that? Like I said, we'd like to lay everything out for you and then sit back and listen to what you have to say. We'll listen to anything that you have to say. Anything. You can dispute anything that we might say, and then we'll listen to you. You understand that? Okay. Like I said, all we have at this point is what we've heard up to this point. We would love to hear from you. You understand? We're fair. You've probably got two of the fairest people at the Homicide Unit talking to you right now, okay? Like I said, that's your prerogative. Like I said, we'd love to lay it out and get you to talk to us, but like I said, you don't have to. But we would love for you to talk to us, and we can stop so you can see exactly where we're coming from and go from there. Is that something you'd like to do?

[WILLIAMS]: I don't even know what's going on. That's why I ask you what's the incident.

[DETECTIVE HARRIS]: That's what I said. I can read you your rights. Like I said, after that, we can talk. Like I said, if you don't like what I'm saying you ain't got to say nothing.

[WILLIAMS]: I don't know what's going on, so I—

[DETECTIVE HARRIS]: Okay. This incident happened January in College Park. Through our investigation your name came up. Like I said, this is your opportunity to say, yeah, you were involved or no, you weren't involved.

[WILLIAMS]: I don't know anything about what you all are talking about.

[SERGEANT MCDONALD]: Well, we can get to that. We got to go over your, your rights, first.

[WILLLIAMS]: I know. I still, I don't know what,—

[SERGEANT MCDONALD]: I understand that. I understand that. But we got to go through the process. Before we can ask you were you involved, we got to,—

[DETECTIVE HARRIS]: We got stuff we got to take care of before we,—

[WILLIAMS]: Yeah, I understand that. I still don't know,—

[SERGEANT MCDONALD]: I understand that. But we still got to go through the process, though. You know. We want to talk to you, but we got to go through the process.

[DETECTIVE HARRIS]: We want to lay everything out to you, but you have to agree to, you want to at least hear what we have to say, and that's fine. But you say you don't, once we read you your rights, if you don't have nothing to do with it, then we just get up and roll. But we can't get into it until we get through that. That's all I'm saying. So if you're sitting here and wondering why you're here, we, we're ready to tell you why you are here.

[WILLIAMS]: We already know but it's so, you all sound, it sounds so confusing. I don't know—

[SERGEANT MCDONALD]: It's not confusing. Let me break it down to you like this right here. You be, you watch T.V., right? Do you see when the police walk up to somebody, and we want to ask you, we want to talk to you about something, we always read the person their rights? You've seen that on

4

T.V., right? They say, you've got the right to remain silent. Anything you say can and will be used against you in court. You've heard that before, haven't you? Yeah. We have to go through that formality to get to what we want to talk about. That's, we have to go through that formality.

[WILLIAMS]: **I don't want to say nothing. I don't know,—**

[SERGEANT MCDONALD]: But you don't have to say nothing.

[WILLIAMS]: **Yeah.**

[SERGEANT MCDONALD]: You don't have to say nothing. That's, you know, that's your right. But to get to one point, from point A to point B, we have to read you your rights. And the key word is, they're your rights. So we got to read them to you, so you understand.

(emphasis added).

In addition to the videotape of the interview, Detective Harris turned on a tape recorder before reading Williams his *Miranda* rights and then asking several follow-up questions:

[DETECTIVE HARRIS]: And I told you, it's your prerogative, but we'd love to get everybody's side. All we got is one side. One side at this point. We couldn't risk just asking in confidence. We have to take it.

(Tape recording begins.)

[DETECTIVE HARRIS]: My name is Detective Harris with the Prince George's County Police Department. Today's date is March 30, 2011. The time is 1:58, put 13:58 on here because we use military time. All right? I am now going to read to you your rights under the law. If you do not understand something I say to you, please stop me and I will explain it to you. Okay? You have the right to remain silent. If you chose to give up this right, anything that you say can be used against you in court. You have the right to talk to a lawyer before you are asked any questions, and have a lawyer while you are being questioned. If you want a lawyer but cannot afford one, a lawyer will be provided to you at no cost. If you want to answer questions now without a lawyer you still have the right to stop answering at any time. That's what I emphasized before we started. You understand that? At this point in time, would you like to make a statement or would you like to talk

5

about why we are here, without a lawyer? Okay. Have you been promised anything? Have you been offered any kind of reward or benefit, or have you been threatened in any way in order to get you to make a statement? Have I threatened you? Has he threatened you?

[WILLIAMS]: (No verbal response.)

Williams then received a copy of the Prince George's County Advice of Rights form from Detective Harris, from which Williams read a portion aloud; the questioning continued:

[WILLIAMS]: Man, I don't know. Is this for my best interest?

[DETECTIVE HARRIS]: Hold on for a second. Now, let me show you a couple, a couple of pictures real quick, okay? See, what we don't want you to do is have us leave here thinking that you went in there specifically to kill somebody. That's what you don't want us to do. You understand that? That means you premeditatively went in there with your gun and gunned this guy down. You don't really want us to believe you were doing that. Do you understand that? Do you understand what I'm saying?

[WILLIAMS]: Yeah.

[DETECTIVE HARRIS]: That's different, that's different than a robbery gone bad.

[WILLIAMS]: Yeah. I hear, I hear, I hear what you all are saying, but –

[DETECTIVE HARRIS: Hold on, hold on, hold on

\*   \*   \*

[DETECTIVE HARRIS]: Okay. Now, but somebody that we've talked to, just let me talk for a minute. You can talk in a minute, said hey man, this guy just walked in this house and gunned this dude down, took his stuff, and rolled out. Would you want us to believe that? This right up came in, gunned him down, didn't say shit, and just smoked this dude and walked out the house. That would be a bad thing, wouldn't it? That's no altercation. That's no talking. But you, but it was a person there that might have said that. Hey man, this black guy just came in, gunned the dude down, and walked

6

out. Now, if somebody said, hey man, he came in. He did try to rob him but I don't think he tried to kill this dude, and they got into a bad fight, and actually the guy that came in with the gun felt that maybe he was going to get hurt and he shot in self defense, now that's a whole different story than a dude just walked in, pop, killed the dude and walked out, took his stuff, and rolled, right? That's two different stories that a police officer has to investigate and charge.

[WILLIAMS]: The only, --

[DETECTIVE HARRIS]: I'm, I'm just saying. That's two scenarios.

Detective Harris again characterized the two different scenarios, stating:

[DETECTIVE HARRIS]: … There are two different charges here. There is a pre-meditated going in, blasting somebody away, taking their stuff and roll. That's a bad charge. We go by his story, the fact that you went in there, he had no intentions on killing this dude. None. Stuff got out of hand, the dude wouldn't talk, wouldn't putting up what he was saying [*sic*]. The dude is a big dude. You're kind of a slim dude, and he wanted to fight. He wanted to see whether or not you had balls enough to pull the trigger. Came after you, you gave a warning shot. He still wouldn't listen to what you were saying, and then bam, all hell broke loose. Glass breaking, whole nine. That's a different charge, okay? All I'm saying is, I would not, if I were you, I would not want us to leave here thinking that you walked in that house, popped this dude, premeditated, walked in there, I'm going to kill this cat, take everything in the house, and roll out. You may never see outside again if you let us leave here thinking that.

\* \* \*

[DETECTIVE HARRIS]: But, you ain't even go that hard. You didn't even go that hard, and like I tell you, it's not a, we're not here to ask you things in reference to were you there or what? We know that. We already know you were there. That's not the point. The point is, you're the only one, we can't go by what you said while you were there or what happened. We can't go by what he said why you were there or what happened, because they may be trying to cover up, you know, make it look good for you. Maybe they're trying to help you out. Hey man, he didn't mean to shoot nobody. Man, who, I'm the police. As far as I'm concerned, you walked up in that joint with the intentions of killing that dude. But I need to hear from you and figure out how sincere you are that that's not what you meant to happen. That's the only reason why

7

we're here, and if we were some heartless bastards we could just, screw it, first degree murder. He went in there. He premeditatedly killed that dude, and that's it. We ain't taking no deals. We're walking out the door. We ain't even talking to you. Send you straight to jail. I mean, if that's the way, I mean, but we're not like that. We, we want to give people opportunities.

The Detective then told Williams he had already been charged; two potential scenarios again were discussed, at which point Williams confessed:

[WILLIAMS]: If I'm already being charged.

[DETECTIVE HARRIS]: Well, you were charged when you got here. I mean, that's, --

[WILLIAMS]: Yeah, yeah, I know.

[SERGEANT MCDONALD]: But what you think they're going to charge you, just grab you off the street?

[WILLIAMS]: **You all tell me I'm already being charged with that shit. No matter what you all find out, they're going to smoke my boots anyway.**

[DETECTIVE HARRIS]: That's not true.

[SERGEANT MCDONALD]: No, that's not, that's untrue.

[DETECTIVE HARRIS]: That ain't true.

[SERGEANT MCDONALD]: We have to go, like I said, to get from one point to the other point, we got, we got certain procedures where we got to go through. To get you here, and we had probable cause, what we call probable cause to get an arrest warrant for your arrest, because we had information that you were involved in this incident. That gives the probable cause to get you arrested, bring you, to arrest you. That's the point we're at. It's just called probable cause. We're not the court. We just do our end of it, and we take care of the, our end, and we, we the first ones that get to talk to you.

[DETECTIVE HARRIS]: And your statement goes a long way. I mean, you, just because you're arrested, like you said, we could not risk just going out

8

and trying to find you without arresting you. We have probable cause for that, okay? So we type it up. Your statement goes a long way because we have evidence. You already lied to us and said you was never in the house. That's a lie. You already lied to us, flat out. Flat out lied to us. You was in that house. We know that. All I'm saying is at this point, if I were you, I would try to keep my deception or my lies to a minimum because everything, everything, it's like a point system. You're getting graded now. You cannot lie. You cannot lie. You understand that? When you talk, when it comes to a point you're going to be like, damn, why did I tell them that? And them guys told me X, Y, Z, and they were straight up with me.

[SERGEANT MCDONALD]: Yeah. This is me. I'm normally, I mean everybody I talk to, I'm always straight up. It is what it is. I've never come in, try to, --

[DETECTIVE HARRIS]: It could be as simple as a robbery gone bad, or a flat out cold blooded first degree murder. It's as simple as that. Robbery gone bad. First degree murder. Prove it.

[WILLIAMS]: I'm going to tell you all.

[DETECTIVE HARRIS]: What happened?

[WILLIAMS]: I'm going in the joint and shit. I'm [*sic*] didn't even have a mother fucking gun out, or no shit like that. So, like you said, somebody came in the house. But at this point, there still wasn't no mother fucking gun or nothing like that. The dude rushed me and shit. So I whipped the gun out and shit. He tried to take the mother fucking gun. So, I shoot the gun, but I don't want to shoot him. He's still trying to take the mother fucking gun. Boom. I shoot the gun again. Then after that, I don't know where the fuck I shot, but I didn't want to hit him or nothing, no way. I just was trying to get him off me and shit, because he was on me and shit, and then that was that.

(emphasis added).

Williams continued to describe to Detective Harris and Sergeant McDonald the events at the house which led to the shooting of Justin DeSha-Overcash and then inquired as to whether or not he might "see the street again":

9

[WILLIAMS]: Hell, yeah. Sorry I got to ask you all a question. Even after like, I mean, am I ever going to see the street again? You all know.

[SERGEANT MCDONALD]: Look, dude. We can't get into that.

[DETECTIVE HARRIS]: We'd love to.

[SERGEANT MCDONALD]: We'd love to, we can't. We're not allowed to go down that road, at all, and I'm not going to go down that road because I can't .

[DETECTIVE HARRIS]: Your statement to us is that you did not contentionally (phonetic) go in there to kill that boy, right?

[WILLIAMS]: Yeah, I didn't want, --

[DETECTIVE HARRIS]: I told you it was two ways that thing could have went. Intentional or unintentional. And you told us it was unintentional.

Williams later spoke to the veracity of his story and stated:

[WILLIAMS]: … So, of course, they going to tell you all that shit and cover their, they cover their end, their ass. But that's what I just told you all. Yeah, I know I fucked up as a man and I got to deal with that shit. I'm not going to tell you all no lies or no mother fucking stories, for what? It's too late in the game for all that, but that's what happened.

[SERGEANT MCDONALD]: I respect you for that, brother. I ain't going to lie to you. I'll meet you on that one.

The interview concluded when Williams stated, again, what had happened and Detective Harris instructed Williams to write down his story:

[WILLIAMS]: It happened so quick. The white boy was on the computer. I think it was either a, it was either a futon bed or a little couch. When I mean the shit happened so quick, so say I'm walking down and he going in the room. I'm like, man, both of you all sit down on the floor and shit, put you all hands out and shit. Soon as I tell them that, I hear the door slam and shit. When I turned around, it's somebody walking down the steps, but they

10

already seen me, so they trying to go out the back, out the back door and shit. Boom, soon as I turned my head back the other way, the dude hit me in the face with something, so I'm really stumbling back. I'm like, oh, shit. So, boom, just reaching for the gun, I was like, boom. I shoot the mother fucker. I'm like, man, I'm telling myself, maybe he going to back up and shit so I can just, what the fuck, he reached for the fucking gun again, and after that, I'm like, man, fuck it. He can keep coming at me and shit. I shot the gun like two or three times and I ran the fuck up out of there.

[DETECTIVE HARRIS]: Okay. What we're going to do now is have you write that down. Write your story down and then we'll ask you a couple of questions and (inaudible). All right?

At the hearing on his suppression motion, Williams argued that he made a declaratory statement invoking his right to silence when, responding to Sergeant McDonald's explanation of the formality of going through Williams's rights, he stated "I don't want to say nothing. I don't know, —" Williams also argued that the statements he made were involuntary because the detectives presented two scenarios characterizing different charges and indicated that under one scenario Williams might "see outside again," while in the other he would spend his life in prison.

The State argued, conversely, that Williams's statement that "I don't want to say nothing. I don't know" was unclear because of the phrase, "I don't know." The State also urged that nothing said by Detective Harris or Sergeant McDonald suggested that Williams would be offered any deal or receive a lighter sentence by choosing a scenario based on a robbery gone bad nor had Williams relied on anything the police promised.

After reviewing the DVD and the transcript, Judge Cathy H. Serrette of the Circuit Court for Prince George's County denied Williams's motion to suppress, after finding

11

Williams's invocation of "I don't want to say nothing. I don't know" to be "ambiguous and equivocal":

> This Court finds the I don't know, as the State indicated, to render what would have otherwise been a clear statement at which time the questions would have to stop an ambiguous and equivocal statement. Thereafter, Sergeant McDonald says, but you don't have to say nothing.
>
> Mr. Williams again says, yeah. Then Sergeant McDonald again says, you don't have to say nothing. That, you know, that's you right. And they continue to talk about it, and again, in more or less a lay manner after which Mr. Williams says, hold on, I'd like to know what's going on. So if you all got to read me my rights, then go ahead. Where after, the Advice of Rights were presented to the Defendant.
>
> Detective Harris went over the Advice of Rights with the Defendant. He asked at this point, would you like to make a statement or would you like to talk about why we are here without a lawyer, and the defendant nodded his head yes. He went on to say, have you been promised anything, have you been offered anything, any kind of reward or benefit or have you been threatened in any way in order to get you to make a statement, have I threatened you, has he threatened you, and Mr. Williams, the Defendant shook his head no. The Advice of Rights went on.
>
> The Detective asked Mr. Williams if he could read, but didn't take his word for it. He actually had him read something out loud to make sure that he wasn't just asserting that he was intelligent and literate, but indeed he was literate, and he then gave it to Mr. Williams to read.
>
> In observing the DVD, one notes that Mr. Williams did not just take the form and sign it as one often does when one gets a contract, but rather actually took his time and read over the Advice of Rights which he did then sign. Accordingly, this Court does not find the claim, vis-à-vis the Miranda Rights, to be a valid claim and finds the State has met its burden as regards to that claim.

Judge Serrette then addressed the voluntariness of Williams's confession and determined that it was voluntary:

The second issue is the issue of whether or not the actual confessions were coerced or whether they were truly, voluntarily and intelligently made. A review of the DVD indicated that the interrogation was certainly not a long prolonged interrogation. The Defendant was not cuffed. There was no allegations of any physical coercion, and the interaction between the Defendant, Sergeant McDonald and Detective Harris was indeed cordial. To be sure, the detectives distinguished premeditated murder and a robbery gone bad. However, Defendant's refusal to acknowledge on the stand that the gone bad part of the robbery gone bad was a shooting of the victim flies in the face of the DVD and the transcript and is simply not credible.

The officers in this matter clearly employed trickery regarding the DNA and fingerprinting, yet such trickery is permissible. The question is whether the Defendant's statements were coerced or compelled or whether they were freely, voluntarily made.

The Court agrees with the State that the Defendant was well aware that not only did he have an option not to speak, but that he had repeatedly been advised that he could stop speaking at any time even if he had started to speak. The Court further finds that the Defendant's statements during the interrogation, including that on Page 36, no matter what you all find out, they're going to smoke my boots anyway, and that which is found on Page 46 of the transcript, I mean, am I ever going to see the street again, do you all know, indicate that he did not have the misunderstanding that he now alleges.

Considering the totality of the circumstances, this Court does not find that the Defendant's decision to give a statement was the product of physical or psychological coercion, nor that the officer's conduct in this case overbore his will to resist or otherwise brought about a statement not freely self-determined by the Defendant. Accordingly, the Court finds that the State met its burden of proof, and the motion to suppress will be denied.

Williams was convicted on a not-guilty statement of facts of first degree murder and use of a handgun in the commission of a crime of violence. He was sentenced to life in

13

prison, with all but 49 years suspended for first degree murder and a concurrent 20 year

sentence for use of the handgun in the commission of a crime of violence.[2]

On appeal, Williams presented two questions;[3] the Court of Special Appeals

affirmed. In a reported opinion, *Williams v. State*, 219 Md. App. 295, 100 A.3d 1208

(2014), rejecting the State's argument that a pre-*Miranda* statement was involved, the

intermediate appellate court, noting that the statement "I don't want to say nothing" was a

clear invocation of the right to silence, concluded that the addition of "I don't know"

rendered the statement ambiguous:

> We agree with the suppression court, however, that the "I don't know, —"
> appended to the statement, and made by [Williams] in the same breath as the
> first portion of his comment, renders what would have otherwise been a clear
> statement at which time the questions would have to stop an ambiguous and
> equivocal statement.

*Williams*, 219 Md. App. at 326, 100 A.3d at 1226 (internal quotation omitted). Our brethren

also determined that, viewed objectively, statements made by Williams prior to his saying

---

[2] The remaining counts against Williams were placed on the Stet docket.

[3] The questions presented to the Court of Special Appeals were:

> 1. Did police violate [appellant's] right to remain silent during a custodial
> interrogation when he said, "I don't want to say nothing. I don't know,—" to
> which the police responded "But you don't have to say nothing" but
> continued with the interrogation?
> 2. Was [appellant's] confession voluntary under Maryland common law
> because the police implied that [appellant] might see outside again if he
> confessed to a robbery gone bad instead of premeditated murder?

*Williams v. State*, 219 Md. App. 295, 303 n.3, 100 A.3d 1208, 1213 (2014).

"I don't want to say nothing. I don't know—" revealed an attempt by him to understand what the officers were investigating. With respect to the officers' viewpoint, "[I]t is enough for our purposes that, from an objective standpoint, a reasonable police officer would have believed that the comment [Williams] made was ambiguous." *Id.* at 328, 100 A.3d at 1227.

Our intermediate appellate court then addressed the question of whether or not Williams's confession was voluntary and "conclude[d] that the police did not make any improper promises or inducements to secure [Williams's] confession. Accordingly, [Williams's] confession was not involuntary under Maryland's nonconstitutional law." *Id.* at 339, 100 A.3d at 1234.

We agree.

Under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an individual in custody, or otherwise deprived of his freedom, must be advised, prior to any questioning, of his Fifth Amendment[4] rights,

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479, 86 S. Ct. at 1630, 16 L. Ed. 2d at 706-07. If the individual invokes his right to remain silent, the questioning must cease. *Id.* at 473-74, 86 S. Ct. at 1627, 16 L. Ed. 2d at 723.

---

[4] Specifically, the Fifth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, provides, "No person shall … be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law …" U.S. Const. Amend. V.

What constitutes an invocation of the right to remain silent and its parameters was the subject of *Berghuis v. Thompkins*, 560 U.S. 370, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010), a post-conviction case, in which the Supreme Court considered whether Thompkins had invoked his right to remain silent by, in fact, remaining silent after being advised of his *Miranda* rights. In deciding that silence was not a sufficient invocation, the Court relied on the tenets of *Davis v. United States*, 512 U.S. 452, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994), which involved the right to an attorney:

> There is good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously. A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that "avoids difficulties of proof and … provides guidance to officers" on how to proceed in the face of ambiguity.

*Id*. at 381, 130 S. Ct. at 2260, 176 L. Ed. 2d at 1111, quoting *Davis*, 512 U.S. at 458-59, 114 S. Ct. at 2355, 129 L. Ed. 2d at 371. Essentially, the *Davis* inquiry requires that a suspect's invocation of *Miranda* must be unambiguous:

> If an accused makes a statement concerning the right to counsel "that is ambiguous or equivocal" or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights. … A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that "avoids difficulties of proof and … provides guidance to officers" on how to proceed in the face of ambiguity.

*Id*. at 381, 130 S. Ct. at 2259-60, 176 L. Ed. 2d at 1110-11, quoting *Davis*, 512 U.S. at 458-59, 114 S. Ct. at 2355, 129 L. Ed. 2d at 371 (internal citation omitted). The Supreme Court concluded that, "Thompkins did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements,

he would have invoked his right to cut off questioning." *Id*. at 382, 130 S. Ct. at 2260, 176 L. Ed. 2d at 1111 (internal quotation omitted).

Heretofore, we have not had the opportunity to address the efficacy of the invocation of the right to remain silent, but have discussed the logistics of invoking the right to counsel in *Ballard v. State*, 420 Md. 480, 24 A.3d 96 (2011). In that case, after Ballard had been given, and waived, his *Miranda* rights, he offered several responses to the interviewing detective's questions. When the detective pressed Ballard to explain what happened, Ballard stated, "You mind if I not say no more and just talk to an attorney about this." *Id*. at 485, 24 A.3d at 99. Relying on *Berghuis* and *Davis*, we held that Ballard's statement was an unambiguous and unequivocal invocation of his right to an attorney. We identified the phrase "you mind if . . ." as a colloquialism and not as a question to the officers but a clear message that he wanted an attorney.

Several of our sister state courts have had occasion to address what constitutes a clear invocation of the right to remain silent and that which is an ambiguous one. Cases in which the courts have determined that the right to remain silent has been invoked include *Buster v. Commonwealth of Kentucky*, 364 S.W.3d 157 (Ky. 2012), *People v. Arroya*, 988 P.2d 1124 (Colo. 1999), and *State v. Strayhand*, 911 P.2d 577 (Ariz. Ct. App. 1995).

In *Buster*, after having been read her *Miranda* rights when she arrived at the police station, Buster told an officer that "she had nothing to say to him." 364 S.W.3d at 160. The Kentucky Supreme Court held that "there was nothing equivocal about Appellant's assertion of her right to remain silent", and that any further questioning of Buster "did not scrupulously honor [Buster's] right to cut off questioning." *Id*. at 163, 167.

17

In *Arroya*, the Supreme Court of Colorado considered, during an interlocutory appeal, whether the statement, "I don't wanna talk no more", was an invocation of Arroya's right to remain silent. 988 P.2d at 1127. Arroya had been interviewed two different times over a span of three hours. *Id*. During the second interview, when the police officer pressed Arroya about the circumstances of her son's death, she made incriminatory statements. *Id*. During the interview, the officer asked her if she wanted a break to which she replied, "I don't wanna talk no more." In affirming the suppression of statements she made after the statement, "I don't wanna talk no more", the court cautioned that "the scope of a trial court's analysis should not be limited to the words as they appear on their face" and surveyed "the circumstances surrounding the statement in order to assess the words in context" before concluding that the trial court properly found Arroya invoked her right to remain silent. *Id.* at 1132-33.

Finally, in *Strayhand*, Arizona's intermediate appellate court analyzed the voluntariness of Strayhand's confession after he had said, "Well I don't want to answer any more. I mean, I'm in, fuck it. I'm going to have a fucked up life." 911 P.2d at 583, and later stated, "I can't do this shit", and even later remarked, "I'm not going to talk worth a shit anyway so it doesn't matter to me." *Id*. The court determined that Strayhand's initial invocation of his right to silence was clear:

> The Defendant's first invocation, "Well I don't want to answer anymore," could not have been clearer. The additional words "I mean I'm in, fuck it. I'm going to have a fucked up life" do nothing to confuse or detract from the idea that the Defendant did not want to answer any more questions. His other repeated indications that he did not want to answer questions, if less clear, were clear enough.

18

*Id.* at 591.

What constituted an ambiguous and equivocal invocation of the right to remain silent, conversely, was addressed in *U.S. v. Sherrod*, 445 F.3d 980, 982 (7th Cir. 2006). In the case, Sherrod asked the interrogating officer what he was charged with, but the officer "insisted that they finish reviewing the written *Miranda* warnings before proceeding with the interview." *Id*. In response, Sherrod declared, "I'm not going to talk about nothin'" and, further, emphasized, "I'm not gonna talk about nothin' – if you'd give me a picture of what's going on, but I ain't gonna talk about shit." *Id.* Sherrod argued that his statement that he was "not going to talk about nothing" was an invocation of his right to remain silent. *Id*. The Seventh Circuit Court of Appeals affirmed the denial of Sherrod's motion to suppress, explaining, "A suspect telling a police officer that he's 'not going to talk about nothing' is as much a taunt – even a provocation – as it is an invocation of the right to remain silent. When Sherrod wanted to end the interview, he knew how to do it unambiguously." *Id*.

In. *U.S. v. Banks*, 78 F.3d 1190, 1196, n.6 (7th Cir. 1996), *vacated on other grounds sub nom. Mills v. United States*, 519 U.S. 990, 117 S. Ct. 478, 136 L. Ed. 2d 373 (1996), Banks argued that his statement "Get the f— out of my face. I don't have nothing to say. I refuse to sign", statements made while he was seated in the back of the patrol car after having been presented with a *Miranda* waiver form, was a clear invocation of his right to remain silent. *Id.* The Seventh Circuit Court of Appeals disagreed, relying on a finding that the statement was not clear:

Mr. Mills' response of "I don't got nothing to say," standing alone, could be construed as an invocation of his right to remain silent. Yet, when placed in the context of his other comments, the alternate interpretation—that it was merely an angry response to the form in front of him – is also possible. Given these two possible interpretations, the magistrate judge's determination that Mr. Mills' statement, when considered in context, was not a clear, unambiguous assertion of his right to remain silent cannot be disturbed by this court.

*Id.* at 1197.

In *State v. Nixon*, 298 P.3d 408, 415 (Mont. 2013), Nixon stating repeatedly during his interview with police, "There isn't really anything to talk about", was held to be an equivocal invocation of his right to silence. When Nixon was arrested, he had been provided with a copy of his outstanding warrants. *Id.* at 411. At the start of the interview, Nixon answered general questions regarding his address and his whereabouts on the evening in question. *Id.* After giving Nixon his *Miranda* rights, the officer asked him, "[D]o you want talk to me?". Nixon replied, "There isn't really anything to talk about" and repeated that statement each time the officer asked if Nixon was interested in talking. The court rejected Nixon's assertion that he unequivocally invoked his right to silence, explaining that given Nixon's statements, a "reasonable police officer in the circumstances would understand Nixon's statements to mean that the outstanding warrants were self-explanatory and did not provide a sufficient topic of conversation." *Id*. at 417.

Whether the phrase "I don't know" was an ambiguous invocation of the right to remain silent was considered in *State v. Holmes*, 102 P.3d 406, 414 (Kan. 2004). Holmes stated, "I think I'll just quit talking. I don't know" and the Kansas Supreme Court held his words to be an ambiguous invocation of the right to remain silent. *Id*. After responding to

a 911 call in which Holmes declared that he had shot his girlfriend, the officers, after reading him his *Miranda* rights at the scene, asked Holmes about his relationship with the victim. *Id*. When they asked him about the fatal shooting of his girlfriend, Holmes shook his head and said, "I think I'll just quit talking. I don't know." *Id*. The officer understood the defendant's statement "to mean that he was uneasy about the line of questioning and that he did not appear comfortable with the direction the conversation was taking." *Id*. at 419. The Supreme Court of Kansas reasoned that Holmes's statement "could be construed as not wanting to talk about the shooting details at that moment in the interrogation but not knowing if he should. However, Holmes' statement could also be construed as an assertion of his right to remain silent. Nevertheless, the officers followed proper procedure by further inquiring whether he wanted to talk about something else." *Id*. at 420.

In *State v. Hassel*, 696 N.W.2d 270, 274 (Wis. Ct. App. 2005) *cert. denied*, 286 Wis. 2d 99 (2005), Hassel's statement, "I don't know if I should speak to you" was determined to be an ambiguous invocation by the Wisconsin intermediate appellate court. The court determined that Hassel's statement was not a clear invocation of his right to remain silent, explaining "[i]t does not indicate Hassel's desire to remain silent, only his uncertainty as to whether he should."[5] *Id*.

The essential inquiry that the courts rely upon in all of the above cases is whether the invocation is clear or ambiguous. The test applied, generally, using an objective standard, is whether a reasonable police officer in the circumstances would understand the

---

[5] The Wisconsin intermediate appellate court also noted that Hassel conceded that his statement was ambiguous. *State v. Hassel*, 696 N.W.2d 270, 274 (Wis. Ct. App. 2005).

statement to be an invocation of the right to silence. *See Berghuis*, 560 U.S. at 381-82, 130 S. Ct. at 2260, 176 L. Ed. 2d at 1110-11.

Assuming for the sake of our analysis that in the instant case *Miranda* rights were implicated, the trial court and our intermediate appellate court determined that the addition of "I don't know" rendered Williams's statement ambiguous. As the trial court stated, the "I don't know" at the end of Williams's first statement, "render[ed] what would have otherwise been a clear statement at which time the questions would have to stop an ambiguous and equivocal statement." The Court of Special Appeals agreed. Our intermediate appellate court reasoned:

> As a classic expression of uncertainty, "I don't know" introduced a level of doubt into the message being communicated by appellant to Detective Harris and Sergeant McDonald. Indeed, the inclusion of those three words strongly suggest that appellant himself—let alone the police officers whom the law charges with understanding his intent—was unsure of how to proceed. At most, [Williams's] comment suggested that he *might* want to remain silent.

*Williams*, 219 Md. App. at 327, 100 A.3d at 1226-27 (emphasis in original).

In the present case, Williams argues that his statement, "I don't want to say nothing. I don't know" was a clear invocation of his right to remain silent. He asserts that his statement of "I don't want to say nothing" followed by "I don't know" was not an equivocation, because the detectives cut him off by saying "But you don't have to say nothing." Williams insists, contrary to the trial court's conclusion, that the only reasonable interpretation of "I don't know" was a continuation, not a renunciation, of the previous sentence, which was confirmed by his tone of voice, speech cadence, and body language. Finally, Williams argues that there is no need for a court to speculate about the meaning of

22

his "I don't know", because Sergeant McDonald repeatedly responded "But you don't have to say nothing" after having interrupted Williams.

The State insists that Williams's "I'm not going to say nothing. I don't know" was the consummate expression of indecision and ambiguity, and, as a whole, was not sufficient to convey to a reasonable police officer that he wished to stop the interview. The State disputes Williams's assertion that Sergeant McDonald cut him off and counters that the detectives and Williams frequently talked over one another. The State emphasizes that to speculate about Williams's tone, cadence, or body language is inappropriate because the purpose of requiring a suspect to clearly articulate that he wants to invoke his right to silence is so that police officers do not have to guess what is being said. The State argues that Sergeant McDonald understood Williams's statement to express indecision about whether he wished to proceed, and because of this indecision Sergeant McDonald's repeated statements that Williams did not have to speak with them were an attempt to clarify whether Williams wished to continue to speak with the police.

Did the addition of "I don't know" after "I don't want to say nothing" in the present case convert what could be construed as a clear statement into an ambiguous one? As in *Holmes*, in which the Supreme Court of Kansas interpreted "I think I'll just quit talking, I don't know" as ambiguous, 102 P.3d at 420, a reasonable police officer could have interpreted Williams's statement as that of one who, in weighing his options, was deciding whether or not he wanted to talk. The "I don't know" statement could have been him weighing his options about wanting to talk or not knowing whether to speak. Williams may have been unsure about whether to proceed with the interview and curious about why he

23

was being interviewed. A reasonable police officer could have understood the statement "I don't want to say nothing. I don't know" to be an ambiguous request to remain silent.

Williams asserts, however, that the officers actually understood that he invoked his right to silence, because Detective Harris stated, "But you don't have to say nothing." The extended colloquy, however, reflects that Williams consistently stated "I don't know" related to his knowledge about the incident in question, to which the detectives responded repeatedly that he did not have to say anything. Williams repeated a variant of the statement that he did not know about that which the detectives were investigating six times before the final "I don't know", which could have led a reasonable police officer to believe that Williams did not want to talk about an incident in January about which he consistently portrayed ignorance in various contexts during the course of the interview, whether or not the detectives were talking over him.

As a result, we determine that the addition of "I don't know" to the preceding sentence of "I don't want to say nothing" created ambiguity as to whether Williams wanted to invoke his right to remain silent.

Williams, of course, would have us rely on the cases in which the courts determined that there was a clear invocation of the right to remain silent. *Buster*, *Arroya*, and *Strayhand* are inapposite, however, because the language in *Buster* that she "had nothing to say", as well as that in *Arroya* of "I don't wanna talk no more", and in *Strayhand* of "Well I don't want to answer any more. I mean, I'm in, fuck it. I'm going to have a fucked up life" were clearly invocative of the right to remain silent.

24

Whether Williams's confession was the result of an improper inducement and, thus, involuntary under Maryland criminal law is our next inquiry.

Williams asserts that his confession was involuntary because the detectives implied Williams "might see outside again if he confessed to a robbery gone bad instead of a premeditated murder." Williams alleges that the detectives led him to believe that "a robbery gone bad was not a 'bad charge,' that a deal might be offered if he confessed to a robbery gone bad, and that his boots might not be smoked if he confessed to a robbery gone bad."

"[U]nder Maryland criminal law, independent of any federal constitutional requirement, if an accused is told, or it is implied, that making an inculpatory statement will be to his advantage, in that he will be given help or some special consideration, and he makes remarks in reliance on that inducement, his declaration will be considered to have been involuntarily made and therefore inadmissible." *Hillard v. State*, 286 Md. 145, 153, 406 A.2d 415, 420 (1979). Judge Irma Raker writing for this Court in *State v. Tolbert*, 381 Md. 539, 558, 850 A.2d 1192, 1203 (2004), articulated the two-pronged test for involuntariness by inducement: "We look first to see if the police made a threat, promise, or inducement. If that prong is satisfied, we look next to see whether there was a nexus between the promise or inducement and the defendant's confession." Since *Tolbert* we have had occasion to further explore the two-pronged test for voluntariness:

> The first prong of the *Hillard* test is an objective one. In other words, when determining whether a police officer's conduct satisfies the first prong, the court must determine whether a reasonable person in the position of the accused would be moved to make an inculpatory statement upon hearing the officer's declaration; an accused's subjective belief that he will receive a

25

benefit in exchange for a confession carries no weight under this prong. Ultimately, the court must determine whether the interrogating officers or an agent of the police made a threat, promise, or inducement. The threat, promise, or inducement can be considered improper regardless whether it is express or implied.

If the suppression court finds that the law enforcement officer improperly induced the accused, then the second prong of the *Hillard* test requires the court to determine whether the accused relied on that inducement in making the statement he or she seeks to suppress. Specifically, the court must examine whether there exists a causal nexus between the inducement and the statement[.]

*Hill v. State,* 418 Md. 62, 76-77, 12 A.3d 1193, 1201 (2011), citing *Hillard v. State,* 286 Md. 145, 406 A.2d 415 (1979) (citations and internal quotation marks omitted).

In the present case, Judge Serrette, in determining that Williams's confession was voluntary, reasoned that the detectives distinguished between premeditated murder and a robbery gone bad and "employed trickery regarding the DNA and fingerprinting, yet such trickery is permissible" and found noteworthy that Williams was well aware that he had "an option not to speak". Additionally, Judge Serrette determined Williams's statements that, "no matter what you all find out, they're going to smoke my boots anyway" and "I mean, am I ever going to see the street again" indicated that "he did not have the misunderstanding he now alleges." The Court of Special Appeals agreed that Williams's confession was voluntary, relying primarily on *Ball v. State*, 347 Md. 156, 699 A.2d 1170 (1997).

We agree with our brethren on the Court of Special Appeals that our reasoning in *Ball*, 347 Md. at 156, 699 A.2d at 1170, is dispositive. In that case, Ball confessed to the murder of Debbie Goodwich, was convicted and argued on appeal that his confession was "induced by improper promises, threats, and psychological coercion." *Id.* at 174, 699 A.2d

26

at 1178. During Ball's interrogation detectives presented him with two documents prepared by police officers, the first of which stated that "DEBBIE GOODWICH WAS BRUTALLY KILLED IN HER PARENT'S HOME" and described Ball as "A COLD BLOODED KILLER." *Id.* at 168, 699 A.2d at 1175. The other document, in contrast, stated that, "DEBBIE GOODWICH WAS ACCIDENTALLY KILLED IN HER PARENT'S HOME" and described that Ball "HAS HAD A TOUGH LIFE" and "WAS TRYING TO SUPPORT HIS FAMILY". *Id.* at 169, 699 A.2d at 1176. The detective, in response to a question by Ball, responded that the documents "were two different ways of characterizing him." *Id.* Ball subsequently confessed.

Ball argued before us that the presentation of two contrasting versions of the killing and of himself was "psychological coercion" and rendered his statements involuntary. *Id.* at 178, 699 A.2d at 1180. We reasoned that "the record [does not] support Appellant's assertion that the police took advantage of Appellant's ignorance that the two different scenarios both amounted to first degree murder." *Id.* at 180, 699 A.2d at 1181.

Recognizing that "deception short of an overbearing inducement is a valid weapon of the police arsenal," we noted that the police "are permitted to trick the suspect into making an inculpatory statement." *Id.* at 178-79, 699 A.2d at 1180. We explained that, "[s]imilarly, an appeal to the inner psychological pressure of conscience to tell the truth does not constitute coercion in the legal sense." *Id.* at 179, 699 A.2d at 1181. We concluded that, "[t]here is no indication that Appellant's will was overborne by the use of this interrogation method." *Id.* at 180, 699 A.2d at 1181. Furthermore, based on Ball's statement asking "what do they do for me" we concluded that he "apparently recognized,

27

therefore, that under either scenario he would be admitting to the murder of Debra Goodwich." *Id.*

With respect to the argument that his confession was involuntary because of inducement, we reasoned that Detective Bollinger was merely giving Ball "an opportunity to explain his criminal behavior in his own words" and any "benefit" to Ball did not amount to an improper inducement:

> Detective Bollinger was not suggesting to Appellant that the police or any other State official would confer any special benefit or advantage on Appellant in exchange for a written confession. Rather, the message that Detective Bollinger was trying to convey when he stated that it would be "better" for Appellant was simply that a written confession would provide Appellant an opportunity to explain his criminal behavior in his own words. To the extent that this opportunity constituted a "benefit" to Appellant, it did not rise to the level of an improper inducement. That Appellant was aware that no other benefit was to be realized from providing a written confession is evidenced, in fact, by his remark to Detective Bollinger that "I am going to convict myself."

*Id.* at 176, 699 A.2d at 1179.

Our reasoning in *Ball* is applicable in the present case. The officer stated that, "what we don't want you to do is have us leaving here thinking that you went in there specifically to kill somebody" and "that's different than a robbery gone bad." As in *Ball*, presentment of two different ways of characterizing the situation is not an inducement. As Detective Harris aptly put it, "That's two scenarios." We, thus, agree with the Court of Special Appeals that "Detective Harris was merely advising appellant of the *possible* legal consequences of a verdict of first degree premeditated murder at appellant's future trial." *Williams*, 219 Md. App. at 338, 100 A.3d at 1233.

28

Williams, however, also relies on *Lewis v. State*, 285 Md. 705, 722, 404 A.2d 1073, 1082 (1979) in which we stated that there are "limits to the type of police deception which will be tolerated without rendering a confession involuntary, particularly with regard to deception concerning constitutional rights." In addition to other arguments Lewis alleged that his confession was involuntary and that interrogating officers had stated to him that "failure to take a lie detector test would essentially amount to an admission of guilt" as well as that "asking for a lawyer amounted to an admission of guilt." *Id.* at 721, 404 A.2d at 1081. We did not, however, address the issue, because we decided the case on other grounds.

Williams also urges us to adopt the reasoning of the dissent of Judge Raker in *Baynor v. State*, 355 Md. 726, 750-51, 736 A.2d 325, 337-38 (1999) (J. Raker dissenting), in which she acknowledged that, "Courts around the country have held that the giving of false advice as to the possible penalties is a factor affecting the voluntariness determination" and concluded that "[i]n order to properly assess the voluntariness of Baynor's confession, the jury should have been allowed to consider evidence that the detective told him that he faced being put to death summarily." We agree that false advice may be a factor affecting the voluntariness determination, but that is not in issue in the present case.

Even were we to have found that the comments of the police could have been construed as an improper inducement or promise, Williams did not rely on these statements in making his confession. Prior to confessing, Williams stated, "No matter what you all find out, they're going to smoke my boots anyway." His statement certainly reflected

29

Williams's understanding that he would be subject to severe sanctions, no matter what he said.

Williams, however, argues that police "did more than just present Petitioner with two different characterizations of the crime at issue" because, he asserts, they took advantage of his ignorance that the two possibilities presented both constituted first degree murder. Any reliance that Williams now claims based on the detectives' characterizations of the crime is belied by Williams's own statements of "no matter what you all find out, they're going to smoke my boots anyway." As Judge Serrette found, Williams's statement, "I mean, am I ever going to see the street again", indicates that "he did not have the misunderstanding he now alleges."

In conclusion, we hold that Williams's statement, "I don't want to say nothing. I don't know" was an ambiguous invocation of his right remain silent. We further hold that his confession was voluntary.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**

Circuit Court for Prince George's County
Case No. CT110710X
Argued: October 6, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 9

September Term, 2015

---

DEANDRE RICARDO WILLIAMS

v.

STATE OF MARYLAND

---

Barbera, C.J.
Battaglia
Greene
Adkins
McDonald
Watts
Harrell, Jr., Glenn T.
(Retired, Specially
Assigned)

JJ.

---

Dissenting opinion by McDonald, J.,
which Barbera, C.J., and Adkins, J., join

---

Filed: December 18, 2015

Under the Fifth Amendment of the United States Constitution, a suspect in a criminal case has a right to remain silent in the face of police questioning. When the suspect is in police custody, officers must advise the suspect of that right, among others, in a litany that has come to be known as the *Miranda* warnings, and must cease questioning if the suspect invokes the right to silence.[1]

The basic rules are straightforward. But in a particular case there may be uncertainty – as to whether the person is in custody, whether the person has invoked the right to silence, or whether the police have engaged in forbidden questioning. The case law has developed subsidiary rules for grappling with such uncertainties.[2] But it does not support finding ambiguity where there is none – even if it is tempting to do so in a case where the officers are not overbearing and are simply trying to keep the prime suspect talking about his role in a horrendous crime.

The Majority opinion accurately summarizes case law concerning the invocation of the right to silence by a person in police custody, some of it dealing with ambiguous invocations of the right to silence. Much of it, however, does not apply to this case. In

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966); *Michigan v. Mosley*, 423 U.S. 96, 103 (1975).

[2] *E.g., Oregon v. Mathiason*, 429 U.S. 492 (1977) (a parolee who is asked by police to come to the police station and told he is not under arrest is not in custody); *Berghuis v. Thompkins*, 560 U.S. 370 (2010) (simply remaining silent for nearly three hours, without affirmatively saying anything, is not enough to invoke the right to remain silent); *Rhode Island v. Innis*, 446 U.S. 291 (1980) (a conversation between officers within the hearing of a suspect while he is under arrest and being driven to the police station is not interrogation).

my view, a review of the complete transcript and video of the police interview of Mr. Williams leads inevitably to the conclusion that he unambiguously asserted his right to remain silent, and that a reasonable officer would readily comprehend that election. But the officers did not halt the interrogation and Mr. Williams ultimately made oral and written statements that were used as part of the agreed statement of facts that resulted in his conviction. I would hold that the statements should have been excluded from the prosecution's case.[3]

As the Majority opinion notes, the critical juncture in Mr. Williams' interrogation came when he told the detectives: "I don't want to say nothing. I don't know …" In the circumstances of this interview, a reasonable police officer (which, as the Majority opinion discusses, is the relevant legal test) would understand that statement to be an invocation of the right to remain silent. Some context is helpful.

According to the video recording, Mr. Williams had been alone in the interrogation room for approximately one hour when the two police officers entered and began speaking with him. The officers first asked Mr. Williams various questions concerning his background and then began to explain their interest in what he might have to say to them. Mr. Williams stated repeatedly that "I don't know what's going on." The detectives insisted that it was premature for him to respond until they "go through the process." Sergeant McDonald then gave what amounted to a preview of the *Miranda*

---

[3] I do not disagree with the Majority opinion's analysis of the voluntariness issue.

2

warnings.[4]  Mr. Williams responded "I don't want to say nothing," with an audible

emphasis on "nothing" and appeared to be about to repeat the same sentence he had

stated, in one form or another, six times in the prior two minutes – "I don't know what's

going on" – when Sergeant McDonald waved his hands to cut him off and talked over

him.  It is evident from the video that Mr. Williams kept talking, but the content is

indiscernible (to this ear, at least, and apparently to the official transcriber as well) as a

result of the officer's simultaneous comments.  However, it seems a fair inference that

Mr. Williams was simply repeating the same protestation of ignorance that he had given

throughout the interview to that point.

    As the State concedes, there is no ambiguity in the statement "I don't want to say

nothing" as an invocation of the right to remain silent.[5]  Both detectives certainly

---

[4] Sergeant McDonald stated:

> You be, you watch T.V., right?  Do you see when the police
> walk up to somebody, and we want to ask you, we want to
> talk to you about something, we always read the person their
> rights?  You've seen that on T.V., right?  They say, you've
> got the right to remain silent.  Anything you say can and will
> be used against you in court.  You've heard that before,
> haven't you?  Yeah.  We have to go through that formality to
> get to what we want to talk about.  That's, we have to go
> through that formality.

[5] This fact distinguishes this case from every case cited by the Majority opinion as an ambiguous invocation of the right to remain silent:  in each ambiguous invocation cited by the Majority opinion, the suspect never made any statement that, standing alone, would be clear enough to invoke the right to remain silent.  For example, "I think I'll just quit talking," which preceded "I don't know" in *State v. Holmes*, 102 P.3d 406 (Kan. 2004), is ambiguous even standing alone.

3

appeared to interpret Mr. Williams' statement as conveying that sentiment.[6]  Sergeant McDonald's immediate response was "But you don't have to say nothing. … You don't have to say nothing…."  And, shortly thereafter, Detective Harris confirmed that "you have the right to stop answering questions at any time."  However, the officers took the position that it was premature for Mr. Williams to invoke the right to silence at that point in the interview because "to get to one point, from point A to point B, we have to read you your rights."  While the officers' subjective understandings of Mr. Williams' statement is not legally dispositive, the officers appeared to come to the reasonable conclusion that Mr. Williams was trying to assert his right to remain silent.  Essentially, the detectives were telling Mr. Williams that he could not invoke his right to silence until, as Sergeant McDonald phrased it, "we go through that formality" – *i.e*, reciting the full *Miranda* warnings.

Consistent with the apparent position of the officers, the State has argued, before the Court of Special Appeals and in its cross-petition for *certiorari* to us, that Mr. Williams' *Miranda* rights had not yet attached at the time he made the statement in question.  For the reasons explained well in the opinion of the intermediate appellate court,[7] I would reject that argument and hold that the statement was made in the context

---

[6] Mr. Williams' body language also supported this interpretation.  He was leaning back in his chair with his hands in his pockets as if totally disengaged from the interview.

[7] *See* 219 Md. App. 295, 316-23, 100 A.3d 1208 (2014).

4

of custodial interrogation.[8] *See McNeal v. Wisconsin*, 501 U.S. 171, 182 n.3 (*Miranda* rights are to be asserted within "the context of custodial interrogation"). Hence, Mr. Williams could invoke his right to remain silent at that time. The officers' advice to Mr. Williams that he could not assert the right to silence until they reached "point B" was simply incorrect.

Thus, because Mr. Williams' statements would have communicated (and did communicate) to reasonable officers that he chose to say nothing, Mr. Williams effectively invoked his constitutional right to remain silent. The officers should have respected his rights and ended the interview at that time.

Chief Judge Barbera and Judge Adkins advise that they join this opinion.

---

[8] The Majority opinion assumes for the sake of analysis that *Miranda* rights had attached at the time of Mr. Williams' statement, but does not otherwise address the issue. Majority slip op. at 21.