*Jacy Soares v. State*, No. 0149 of the 2019 Term, Opinion by Moylan, J.

**HEADNOTE:**

<u>MIRANDA V. ARIZONA</u> AND THE RIGHT TO REMAIN SILENT – THE SUPPRESSION HEARING -- THE NEED FOR AN INTERPRETER -- THE ROLE OF THE INTERPRETER IS A LIMITED ONE – A WEIGHTY ADVISEMENT: THE <u>MIRANDA</u> CATECHISM PLUS MARYLAND COMMON LAW – AN ENIGMATIC RESPONSE -- DISHONORING THE RIGHT TO SILENCE – <u>MIRANDA</u>'S RIGHT TO SILENCE: THE UNANSWERED QUESTION – THE PARTING OF THE WAYS: <u>WILLIAMS V. STATE</u> – MULTIPLE DEGREES OF SEPARATION – <u>MIRANDA</u>'S RIGHT TO SILENCE WAS NOT SATISFIED – THE RIGHT TO BE INFORMED OF AND ABOUT THE RIGHT TO SILENCE – ARGUABLE INVOCATION OF THE RIGHT TO SILENCE – HONORING THE RIGHT TO SILENCE – COMPUTING HARMLESS ERROR

Circuit Court for Montgomery County

Case No. 133754

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0149

September Term, 2019

_____

JACY SOARES

V.

STATE OF MARYLAND

_____

Leahy,
Shaw Geter,
Moylan, Charles E., Jr.
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed:  November 18, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

The subject of this opinion is <u>Miranda v. Arizona</u>'s right to remain silent, including how that at-times fragile request for silence can sometimes be lost in an overriding cacophony of argumentative noise. The communicative problem is significantly exacerbated, moreover, when the request for silence, as here, has to pass through the prism of Portuguese-English translation. Clarity was in short supply.

\*         \*         \*

**The Suppression Hearing**

The appellant, Jacy Soares, was convicted in the Circuit Court for Montgomery County by a jury, of the possession of cocaine with the intent to distribute and related offenses. On this appeal, he raises the single contention that an inculpatory statement he gave to the police was erroneously admitted into evidence in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Under the unusual circumstances involved in the police interrogation in this case, we are inclined to agree.

It is unnecessary to discuss in any detail the factual circumstances of the crime itself, because our review of the pre-trial suppression hearing is completely dispositive of the appeal. Following the execution of a search and seizure warrant for the appellant's home on April 3, 2018, the appellant was arrested. During the early morning hours of April 4, 2018, the appellant was questioned at the station house by Detective Ryan Street. By the end of the interrogation, the appellant, primarily in an effort to exculpate his wife, had thoroughly inculpated himself. The inculpatory statement was, "It's only my problem. My wife is [sic] nothing to do with it." The issue is whether the interrogation should have terminated before the antecedent question was even asked.

The appellant filed a pre-trial motion to suppress this confession to the police. A suppression hearing was conducted on September 6, 2018. The judge denied the motion to suppress; the appellant's statement was admitted into evidence at the trial; and the conviction followed. This appeal has timely followed.

The question before the suppression hearing below and before us on this appeal is the most fundamental of threshold issues. Was the appellant ever informed of his constitutional right to remain silent when being subjected to custodial interrogation and did he attempt to invoke that right? That basic core of the Fifth Amendment privilege against compelled self-incrimination is, of course, the very opening line of the <u>Miranda</u> catechism: "You have the right to remain silent." It is not enough, moreover, simply to recite those words to the appellant. The suspect must actually be informed of the right. That deeper aspect of effective communication cannot be blithely assumed. When at the suppression hearing, the State questioned Officer Paulo Bonturi about his having advised the appellant about his right to silence, the answer was less than totally reassuring about so fundamental a constitutional right.

Q: Okay. So at some point, did you read those rights to the defendant?

A: <u>I'm pretty sure I did, yes</u>.

Q: Okay. Did you tell him that you have the right to remain silent?

A: <u>I'm pretty sure I did, yes</u>. <u>They are checked off</u>.[1]

---

[1] It would be ironic, of course, if we are hereby challenging the State with the very challenge that the State frequently likes to pose to criminal defendants: "Are you being sufficiently 'unambiguous and unequivocal' with such an answer?" At least by way of general discussion, we are, indeed, so challenging the State.

(Emphasis supplied.)

Miranda v. Arizona's guarantee to criminal defendants of basic criminal rights contemplates more by way of satisfaction than mere lip service. It is not enough to recite the words, if that, and then automatically to check off a box. Would such a mechanical recitation and notation suffice, for instance, as the qualifier for the interrogation of a ten-year-old? If we are properly indulgent about communicating with a ten-year-old, should we be any less indulgent about communicating with someone whose native language is not English? This is the very special communications problem confronting us in this case—communicating with someone whose language is not English.

Frequently the linkage between the reciting of the words and the assumption that the words were understood by the auditor is essentially taken for granted. Not so automatic, however, will be our review in the present case.

**The Need For An Interpreter**

The appellant's native language is Portuguese. Throughout the pre-trial police interrogation of the appellant and at the trial, Officer Bonturi served as the Portuguese-English translator. The appellant's education did not go beyond the elementary school level. His command of English was very poor and, essentially, he communicated with the court only through his Portuguese interpreter. It was also through the interpreter that the appellant communicated with the police, most significantly in the course of the police interrogation of the appellant on April 4, 2018.

It is that police interrogation of April 4, 2018 that gives us significant pause in this case, as we look with close scrutiny at every detail we can discern about that interrogation.

3

The unorthodox interpretive procedure employed in this case also causes us to cast a jaundiced eye at the modality used for the interpreting in this case. As we review the testimony at the suppression hearing, we will be looking very closely at whether the appellant was truly informed of his right to remain silent, and of its implicit option, once the right to silence is invoked, of having the interrogation terminate. We will also look very closely at whether the appellant at one point did not, in effect, invoke his right to silence, only to have that right blithely ignored. We will also be looking closely at the interpretive procedure itself.

## The Role Of The Interpreter Is A Limited One

A brief pause in the trial narration may here be appropriate in order to examine proper procedure in the use of an interpreter. There is a proper and accepted technique for bilingual interpretation (as well as for sign language interpretation for the deaf). The interpreter is not supposed to be a third-party participant in a three-party exchange. The two parties to the exchange are, as in any normal testimonial exchange, the questioner and the respondent. The interpreter's proper role is to be an essentially invisible and mechanical device effectively behind the scenes. When the questioner asks a question, in English, the interpreter simply repeats the words, verbatim, in Portuguese. The questioner does not tell the interpreter to ask the respondent a question. The questioner speaks directly to the respondent as if the interpreter is not even there. When the respondent then answers, he answers directly to the questioner as if the interpreter were not even there. At no time in the interpretive process is the interpreter expected to explain to the respondent what the question means or to explain to the questioner what the respondent means. If in doubt, the

4

questioner must simply interrogate the respondent more closely to resolve such doubt. A skilled interpreter is a necessary logistical aid in a two-party exchange. The interpreter should never become an actual participant in a three-party exchange. The interpreter, moreover, is required to be scrupulously neutral. The use of a police officer as an interpreter is less than ideal.

The interpreter is not supposed to become a witness. In this case, however, the proper interpreter protocol was regularly honored largely in the breach. The interpreter was called upon, as a witness, to give his opinion as to whether the appellant understood his rights and as to whether he invoked his rights. To the interpreter as a witness, moreover, was delegated the dispositive responsibility of concluding whether the appellant's invocation of his right or rights had been unambiguous and unequivocal. That, of course, is not the interpreter's job. For an interpreter, the testimonial <u>bete</u> <u>noire</u> is indirect quotation.

**A Weighty Advisement:**
**The <u>Miranda</u> Catechism Plus Maryland Common Law**

The primary witness at the suppression hearing was Officer Paulo Bonturi, the Portuguese interpreter. At the very outset of the police interrogation of the appellant on April 4, 2018, Officer Bonturi recited the following paragraph to the appellant in Portuguese:

OFFICER STREET: <u>You have the right now and at any time to remain silent</u>.

MR. SOARES: Okay.

OFFICER STREET: Anything you say may be used against you. You have the right to a lawyer before and during any questioning. If you cannot afford

5

a lawyer, one will be appointed for you. <u>You have the right to be taken promptly before a District Court commissioner who is a judicial officer not connected to the police. A commissioner will inform you of each offense you are charged with and the penalties for each offense, provide you with a written copy of the charges against you, advise you of the rights to counsel, make a pre-trial custody determination and advise you whether you have the right to a preliminary hearing before a judge at a later time</u>.

(Emphasis supplied.)

## An Enigmatic Response

We have no idea whether that heavy composite of <u>Miranda</u> rights and Maryland statutory rights was perceived by the appellant in the conjunctive or in the disjunctive. No one ever inquired. It is highly questionable whether it is wise to pack so much substance into a single unbroken advisement, particularly where the unilluminating answer will probably be, "Yes, I understand." Was he supposed to understand them all, moreover, or was he supposed to pick one? Were these cumulative rights or alternative rights? As related by the interpreter, the appellant made a choice among a panoply of rights and opted for a prompt presentment before a commissioner.

> OFFICER BONTURI: <u>He understands. He's saying he wants to go straight to the commissioner.</u> We haven't gotten that far yet, so.

> OFFICER STREET: Okay. <u>So he said he wants to go straight to the commissioner?</u>

> OFFICER BONTURI: <u>Yes.</u>

> OFFICER STREET: <u>Okay. No problem.</u>[2]

---

[2]     That entire exchange was a conversation between Detective Street and Officer Bonturi. They were talking to each other about the appellant. It was not a case of Detective

(Emphasis supplied.)

"No problem"? If Detective Street, who was conducting the interrogation saw "no problem," what did that mean? Whatever "No problem" meant to Detective Street, what did that mean to the appellant? Did it mean that the interrogation would cease and that the appellant would be taken promptly before a commissioner? No such termination, however, remotely happened or was even discussed. Throughout the interrogation, it was clearly Detective Street's strategy to keep the appellant talking. He did not want the interrogation to stop, and he handled Officer Bonturi's conclusions about the appellant's responses in a way that permitted the interrogation to continue moving forward.

To the lawyers in the courtroom, a "prompt" appearance before a commissioner may have meant, as mandated by Maryland statutory law, an appearance within the next 24 hours. To the appellant, by contrast, it may well have meant an immediate alternative to any further police interrogation. "[H]e said **he wants to go straight to the commissioner**." We simply do not know for certain what the appellant meant, and no

---

Street talking directly to the appellant nor one of the appellant replying directly to Detective Street. That is not the role of bilingual interpretation.

If proper interpretive practice were being followed, the transcript would have read more like this:

APPELLANT: I want to go straight to the commissioner.

OFFICER STREET: You want to go straight to the commissioner?

APPELLANT: Yes.

OFFICER STREET: Okay. No problem.

7

one made any effort to find out. In a bilingual context such as this, this is not effective communication. As long as the recitation was nominally correct, no one paid any attention to the appellant's actual wishes. To go immediately before the commissioner, moreover, could mean to end (or not even to begin) the interrogation by the police. This is what the appellant may have been asking for, but we don't know. In any event, the request was ignored without any clarification being sought and the interrogation proceeded.

An aggravating problem with respect to the appellant's wishes is that we do not have the appellant's literal response. What we have is Officer Bonturi's conclusion about what the appellant said.

> A: You may have to play back the very end but <u>I think he said that I have a right to a lawyer or I can go straight to the commissioner</u>, and <u>he said he wanted to go straight to the commissioner</u>, and <u>he shook his head yes every time I, and said yes a couple of times every time I read him one of the lines</u>.

(Emphasis supplied).

Detective Ryan Street, the aggressive lead detective of the interrogation, leaped to the assumption that the appellant had been furnished with all of the constitutional niceties he was entitled to, and that the interrogation could proceed unencumbered.

> OFFICER STREET: <u>But he understands his rights?</u>
>
> OFFICER BONTURI: <u>He understood.</u>[3]

(Emphasis supplied.). That decision, of course, cannot be delegated to the interpreter.

---

[3] A more proper exchange should have been:

> OFFICER STREET: Do you understand your rights?
>
> APPELLANT: I do.

8

As a stark reality, that exchange consists of one policeman (the interpreter) telling another policeman (Detective Street) that the appellant understood all of the rights to which he was entitled, pursuant to both Miranda v. Arizona and the Maryland common law, and that the appellant, albeit aware of those rights, was nonetheless willing to have the interrogation continue. That is a hard sell—unless lip service is enough. As the record itself, to wit, the trial transcript, clearly demonstrates, not a single question was directly asked of the appellant and not a single answer was directly rendered by the appellant touching on the subject of the appellant's understanding of his rights. If there was a private conversation between the appellant and the interpreter explaining the rights, it is not to be found in the record. If we are simply being offered the unexplained conclusions of the interpreter in that regard, we are not told that. We do know that the full legal text of the rights in question was once correctly **recited** to the appellant. Beyond that, everything is pure surmise.

Once Detective Street had the benefit of Officer Bonturi's conclusion that the appellant understood his Miranda rights, however, Detective Street assumed that he and the appellant were on an equal footing as the adversarial battle between them unfolded. The appellant would make his feeble effort to have the interrogation terminated. Detective Street could make his more sophisticated effort to see that the interrogation continued. The longer it continued, of course, the greater the possibility that the appellant would lapse into saying something incriminating. Nothing the appellant said in the course of the skirmish, moreover, would have any efficacy unless it could be determined that, according to a vast and convoluted caselaw well beyond the appellant's ken, the appellant's words were spoken "unambiguously" and "unequivocally." The conclusion as to whether the

appellant's words, in Portuguese, were said unambiguously and unequivocally was, moreover, delegated to Officer Bonturi rather than being inferred by the court from the words themselves. Certainly there was no clarification offered by the appellant himself. This playing field was steeply tilted, even if it might not be considered to be tilted in a monolinguistic context.  It was the interpreter who was concluding as to what the appellant was thinking and understanding and choosing, rather than confining himself to reporting the actual words of the appellant. That, quintessentially, is going well beyond the proper, and largely mechanical, role of an interpreter. There is also some question as to the interpreter's neutrality, but that is another issue beyond the scope of this opinion.

## Dishonoring The Right To Silence

Near the end of the interrogation, there was one very significant question asked by Detective Street that we believe to speak volumes about the purpose and strategic intent of his interrogation. The meaning of the passage is by no means transparent, and we, of necessity, rely on our reading of what the words really say. Officer Bonturi was explaining one of the appellant's responses. The actual transcript of the police interrogation characterized the heart of the response as "unintelligible." The defense brief, on the other hand, describes it thusly: "Appellant 'wants to know if he has to answer' or if he could 'keep his mouth shut.'" In any event, Detective Street jumped in at that point:

> DETECTIVE STREET: You always, I mean, **I'VE ADVISED YOU OF YOUR RIGHTS ALREADY. BUT I'M ASKING YOU THESE QUESTIONS BECAUSE WE'RE TRYING TO MOVE PAST YOU IN OUR INVESTIGATION**. We'd also like to, the place where the cocaine was found was the laundry room, your bedroom, on your wife's side. <u>Does she have any involvement in it?</u>

(Emphasis supplied.)

Our reading of that less than clarion passage credits Detective Street with a very clever, indeed deceptively clever, interrogation tactic to keep the interrogation going. According to our reading of an otherwise obscure passage, Detective Street is agreeing that the appellant, indeed, has a right to silence and the concomitant right to terminate the interrogation. In our reading, moreover, the detective seems to say, "Soares, at this point our interrogation of you as a suspect is finished. But I'm asking a few additional questions of you 'because we're **trying to move past you in our investigation**.' Simply in an effort to interview you as a potential State's witness, we'd like your information about your wife's possible guilt." At that point, of course, the appellant opened up and confessed to his own exclusive involvement. The technique worked, although it strikes us as grossly improper.

**"Move past you?"** Detective Street relentlessly continues the interrogation even as he ostensibly terminates it. He pretends to honor the appellant's <u>Miranda</u>-based right to silence by formally ending the interrogation of the appellant in his capacity as a suspect. He then, however, **MOVES PAST THE APPELLANT** by simply interviewing him in a different capacity, as a witness with respect to his wife's possible criminal involvement. That presumably, in the detective's thinking, would not be an interrogation aimed at the appellant himself, and does not, therefore, trigger <u>Miranda v. Arizona</u>. Keep the appellant talking long enough and he will say something incriminating. The Fifth Amendment, of course, is concerned with whether a person incriminates himself and not with the subject matter being discussed as the medium of that incrimination. If Detective Street's maneuver

11

indicates anything, it indicates that Detective Street knew that the interrogation of the appellant should have terminated. If that were not the case, there would have been no necessity to **MOVE PAST THE APPELLANT.** The appellant was still there, of course, and the appellant, on cue, inevitably incriminated himself. This deliberate **MOVE PAST YOU** sleight-of-hand did not honor <u>Miranda</u>'s right to silence. It played games with it. Detective Street kept the appellant talking long enough and the appellant incriminated himself. If anything, when the ostensible subject matter of the conversation shifted from the appellant's guilt to his wife's guilt, that amped up rather than toned down the factor of compulsion. The detective found the right button to push. This we will not countenance.

In terms of what we are grasping for as the controlling standard for clear and readily understandable communication in the context of police interrogation while using a Portuguese-English interpreter, the explanation to the appellant that "**we're trying to move past you in this investigation**" strike us as badly failing the "unambiguous" and "unequivocal" tests. The State may be "hoist on [its] own petard."[4]

Interrogating a reluctant witness about his wife's guilt can violate the Fifth Amendment Privilege Against Compelled Self-incrimination as readily as interrogating that witness about his own guilt. The State never volunteered an explanation as to what **MOVING PAST YOU** means.

### <u>Miranda</u>'s Right To Silence: The Unanswered Question

---

[4] <u>Hamlet</u>, Act 3, Scene 4.

Throughout the suppression hearing, the hearing judge was bothered by the very question that bothers us. When the appellant expressed his desire to be taken promptly before a commissioner, was this not the way for the appellant, across the Portuguese-English language barrier, to attempt to assert his right to silence. At one point, the judge asked:

> THE COURT: There is no evidence of that other than him saying – <u>the question becomes what is the significance of his invoking or stating that he wanted to be taken to the commissioner.</u> And maybe we should get the exact language he uses that's in the video.

(Emphasis supplied.) Shortly thereafter, the judge asked again:

> THE COURT: Are you saying that – well the question I'm going to say is are you, and this is where I sort of look at it, or what I thought you were doing was <u>what does that mean</u>, <u>I want to be taken to the commissioner? Are you stating that's an assertion of his right to remain silent?</u>

(Emphasis supplied.)

The judge was saying, as are we, "Don't get hung up over the literal words about being taken promptly before a commissioner. Was the appellant, as best he could, attempting to assert his right to keep silent?" No satisfactory answer was ever given. On this Tower of Babel in this case, everyone simply kept talking about sundry issues and nothing was resolved.

> One final time, the judge persisted:

> THE COURT: Well, he's got that. And he got that. I don't think there is any question that he got that. <u>The question</u> is, <u>in my mind would be does that mean something other than what it, on face value is yes, I want to be taken to the commissioner. Does that mean I don't want to talk to you; I want to be taken to the commissioner? Does that mean I want to talk to, I want my attorney taken to the commissioner?</u>

(Emphasis supplied.)

Rather than focusing on the <u>Miranda</u> right to keep silent, however the discussion spun off into one involving Maryland common law violations. Just before the conclusion of the suppression hearing, the hearing judge demanded to know of the State:

> THE COURT: Let me ask, let me just ask [the State] what. <u>He invokes his right to be, and he says I want to be taken to the commissioner. Why doesn't that require that discussion be cut off at that point?</u>

(Emphasis supplied.)

All the court got by way of answer from the State was <u>Perez v. State</u>, 155 Md.App. 1 (2004), holding that the satisfaction of the prompt presentment rule is an important factor but only one of the totality of factors involved in assessing Maryland's common law voluntariness requirement. In the argumentative babble, <u>Miranda</u>'s right to remain silent simply got lost.

The suppression hearing judge, however, resolutely kept his eye on that issue of <u>Miranda</u>'s right to silence. His assessment of the issue before the court paralleled precisely our assessment.

> THE COURT: But the concern or the idea is, is that <u>here he's told of all these rights. He's not an English-speaker. He doesn't have a tremendous level of education.</u> At least self-reported there in the, you know, <u>the information I have is he graduated elementary school. And says, after being told of his rights, I want to be taken to the commissioner.</u> Nobody really, from what I've been shown I could see that <u>there was no real response to that other than they continued to question the defendant at that point in time.</u>
>
> <u>And so the question in my mind is, is there something that should have occurred there that says, you have a right to be taken to the commissioner, but do you want to talk to us, or, can we still talk. We'll take you over there shortly, but. Or, is that an invocation of a right to remain silent implicitly by saying I want to be taken to the commissioner, which would be implicit that</u>

14

I don't want to talk to you. Or, implicit I want counsel. And so that's what I'm, that's because to me, that's the issue. I mean, if this was an invocation of those issues, then the questioning was supposed to stop.

(Emphasis supplied.)

## The Parting Of The Ways: Williams v. State

To that point in the analysis, the suppression hearing judge and this Court saw the circumstances with the same eye. In final argument, however, the State unlimbered the 4-3 opinion of the Court of Appeals in Williams v. State, 445 Md. 452, 128 A.3d 30 (2015) and that was decisive. Once Williams v. State was introduced into the equation, the central thrust of the suppression court's thought process turned on a dime. The appellant's motion to suppress his statement to the police was denied because his invocation of his right to remain silent had not been, in the court's judgment, unambiguous and unequivocal.

> THE COURT: [T]he right has to be invoked directly and unequivocally is what the caselaw says. And I note the case that's really the most remarkable case that I've seen on this issue, whether it's unequivocal or not, is the Williams v. State case. It's a 2015 case out of the Court of Appeals, 445 Md. 452. It's a four to three decision. And in that case, the defendant said I don't want to say nothing. I don't know. And the Court of Appeals ruled that was an equivocal statement of the defendant.
>
> And so if that's an equivocal statement, then the circumstances set forth in that case, I would note that the assertion here that he's questioning whether he has to answer something would be not a direct invocation of the right to remain silent. Similarly, his statement that I want to go straight to the commissioner is not an unequivocal and direct statement that he wants to have counsel.

(Emphasis supplied.)

Factually, Williams is a very simple case. The primary subject with which it deals was, as in the present case, Miranda's right to remain silent. The sub-issue there is that of

whether Williams unambiguously and unequivocally invoked his right to silence. The entire case turned on the interpretation the Court of Appeals placed on the two sentences consisting of nine words, "I don't want to say nothing. I don't know." All seven judges on the Court of Appeals agreed that the first sentence, "I don't want to say nothing," standing alone, would have been an unequivocal invocation of the right to silence. Miranda would have been violated and the conviction would have been reversed.

A majority of four judges, however, held that the second sentence, "I don't know," so undermined the certainty of the first sentence as to taint it as ambiguous and equivocal. In Williams, Judge Battaglia wrote for the majority:

> We agree with the suppression court, however, that the "I don't know,--" appended to the statement, and made by Williams in the same breath as the first portion of his comment, renders what would have otherwise been a clear statement at which time the questions would have to stop an ambiguous and equivocal statement.

(Emphasis supplied.) 445 Md. at 469. See also Berghuis v. Thompkins, 566 U.S. 370, 381, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010); Davis v. United States, 512 U.S. 452, 458-59, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

Judge McDonald's dissenting opinion (joined by Chief Judge Barbera and Judge Adkins), by contrast, would not have credited the three words "I don't know" with such an erosive effect on the earlier certainty.

> Thus, because Mr. Williams' statements would have communicated (and did communicate) to reasonable officers that he chose to say nothing, Mr. Williams effectively invoked his constitutional right to remain silent. The officers should have respected his rights and ended the interview at that time.

(Emphasis supplied.) 445 Md. at 486 (dissenting opinion by McDonald, J.)

16

What then shall we make of <u>Williams v. State</u>? In terms of precedent, did <u>Williams</u> make an absolute statement with respect to the words, "I don't know," at all times and in all places? Of course not! It all depends upon the implicit predicate of the sentence, "I don't know." **DON'T KNOW WHAT?** If the full implicit sentence were, "I don't know about the wisdom of remaining silent. I've got a good story to tell that just might just work," that "I don't know" would express tactical ambiguity and equivocality. But what if the implicit sentence were, "I don't know about that cheeseburger you earlier offered me. Perhaps, I should just say 'No thank you' and go straight home"? That "I don't know" would not invalidate the suspect's invocation of a <u>Miranda</u> right. You've got to know the implied predicate of the abbreviated sentence. Frequently, it is apparent, as in the <u>Williams</u> case itself, but this is not always the case. The three-word fragment "I don't know" simply has no independent life of its own absent a surrounding context.

The indispensable key to that ruling of non-suppression in this case was "**the assertion here that he's questioning whether he has to answer something would be not a direct invocation of the right to remain silent.**" The critical question before the court, even narrowed down to <u>Miranda</u>'s right to remain silent without looking at the right to counsel, is did the appellant suffer a violation of his <u>Miranda</u>-based right to remain silent? The whole phenomenon surrounding the <u>Miranda</u> catechism is a multi-faceted totality. There is A) a necessity to advise a suspect of the existence of the right and, when necessary, to explain the meaning of the rights. There is then B) the opportunity for the suspect to invoke one or both of the <u>Miranda</u> rights. There is then C) the obligation to honor whatever right has been invoked.

17

In this case, the suppression hearing ruling was that the appellant's right to silence had not been violated because it had never been, per <u>Williams</u>, unambiguously and unequivocally invoked. A fair reading— our reading— of the entire suppression hearing, on the other hand, is that to the extent to which the appellant thought that he enjoyed a right to remain silent, he unequivocally invoked it. To the extent to which appellant did not understand that the right to remain silent <u>ipso</u> <u>facto</u> comprehended the right not to answer questions and to have the questioning cease, that was because of the State's failure to have properly advised the appellant in the first instance of <u>Miranda</u>'s right to silence and of what that right to silence consisted. Any hesitancy was based upon a lack of information about the right, not upon a lack of strategic resolution to invoke it. The State may not disclaim a violation of <u>Miranda</u> at point B by relying upon its own earlier violation of <u>Miranda</u> at point A. <u>Williams v. State</u> does not dictate otherwise.

**Multiple Degrees Of Separation**

It is here, in the shadow of <u>Williams v. State</u>, that we part company with the suppression hearing court. The distinctions between the present case and <u>Williams</u> are numerous and dispositive. The degree of distinction is exponential.

The first distinction, a dispositive one, can be found at the very heart of the <u>Williams</u> holding. All parties agree that it was the addendum "I don't know" that transformed an unambiguously affirmative response of "I want to remain silent" into an ambiguous and equivocal expression of uncertainty. The entire <u>Williams</u> opinion turns around the decisive significance of those three words, "I don't know." By way of sharp contrast, the appellant's

response to interrogation in the present case contains not a scintilla of such tactical or strategic uncertainty. In this case, there is no addendum of "I don't know."

Even a purely inferred informative uncertainty such as, "I don't know if I have a right to silence," is far from the same thing as the inferential strategic uncertainty of, "I don't know if I want to exercise such a right." The former would indicate only the inadequacy of the <u>Miranda</u> advisements at a slightly earlier stage of the interrogation.

Another gaping distinction is to be found in the present case itself. This case was one, unlike <u>Williams</u>, where effective communication depended on the services and on the performance of a foreign language interpreter. No such pervasive and omnipresent communication problem was remotely present in <u>Williams v. State</u> itself or in either of the Supreme Court opinions on which <u>Williams</u> was erected: <u>Berghuis v. Thompkins</u>, <u>supra</u>, or <u>Davis v. United States</u>, <u>supra</u>.

Further complicating the distinctive communicative murkiness of the present case are 1) level of the appellant's education (elementary school); 2) the less than ideally neutral status of the present interpreter (a fellow policeman); and 3) the fact that the interpreter in this case did not exercise proper interpretative protocols but actually engaged as a third-party participant in many (if not most) of the exchanges in the course of the interrogation (the words that we are examining for ambiguity and unequivocality are not the words of the appellant but are the conclusions of the interpreter). There was no such overarching atmosphere of communicative difficulty looming over the close exegesis of words and tones and expression in <u>Williams v. State</u> (or in <u>Berghuis</u> or in <u>Davis</u>).

There was, moreover, in <u>Williams v. State</u>, no overt effort by the police interrogator seemingly to accept the appellant's request to remain silent but immediately to subvert it with the stratagem of **WE ARE TRYING TO MOVE PAST YOU**. The <u>Williams</u> case simply does not resemble the case now before us and has nothing to teach us in resolving it. The present case is drowning in communicative murkiness. It is hard to be unambiguous in a maelstrom of ambiguity. It is hard to be unequivocal in a tidal wave of equivocation. <u>Williams v. State</u> does not remotely control the present case.

## <u>Miranda</u>'s Right To Silence Was Not Satisfied

The Fifth Amendment to the Constitution to the United States conferred on every person the privilege not to be compelled in a criminal case to be a witness against himself. In <u>Miranda v. Arizona</u>, the Supreme Court implemented that constitutional privilege by creating a set of protocols that must be followed in the inherently coercive context of custodial interrogation. The first of the <u>Miranda</u>-based protocols is the right to remain silent. In all criminal cases, the burden of proof is cast upon the State to prove that that right to silence has been satisfied. The task before us in the present case is to determine whether <u>Miranda</u>'s right to silence was satisfied.

The satisfaction of <u>Miranda</u>'s right to silence is at least a tripartite obligation. There is first the obligation on the State to inform the suspect of the right to silence. That means more than reciting to a defendant the words on a written form. That also means imparting to a suspect at least a rudimentary understanding of what that right means and what the suspect can do with it.

## A. The Right To Be Informed Of And About The Right To Silence

20

The State has not persuaded us in the present case that this aspect of the right to silence was satisfied. In this case, the material that was recited to the appellant included not simply two constitutional rights pursuant to <u>Miranda</u> but also an equally heavy package of the Maryland common law of voluntariness including the more recent statutory law concerning prompt presentation to a commissioner. That is enough substantive material for a month or two of a law school course in criminal procedure. There were no follow-up questions or inquiries by anyone. Blithely to presume that a mechanical simple reading of such a mass of material imparted the required understanding of the right to silence is highly questionable. When the appellant later questioned whether he had the right not to answer questions, that was stark proof of his lack of earlier understanding. In the official transcript, the appellant is never asked if he understood his rights. Nor did he ever volunteer anything in that regard.

> THE STATE: Okay. So at some point did you read those rights to the defendant?
>
> OFFICER BONTURI: <u>I'm pretty sure I did</u>. Yes.
>
> THE STATE: Okay, Did you tell him that you have the right to remain silent?
>
> OFFICER BONTURI: <u>I'm pretty sure I did</u>, yes. They're all checked off.

(Emphasis supplied.)

We hold that the State has failed to persuade us that the appellant was ever fully advised of <u>Miranda</u>'s right to silence and its implications.

## B. Arguable Invocation Of The Right To Silence

The suppression hearing judge, understandably, never decided whether the appellant's stated desire to be taken before a commissioner amounted to a request to remain silent or not. What was decided was that **even if** it amounted to a request to remain silent, such a request would have been ineffective because it was not unambiguous and unequivocal according to <u>Williams v. State</u>. We have already fully disposed of the <u>Williams v. State</u> issue.

## C. Honoring The Right To Silence

As an alternative and independent holding, we also hold that <u>Miranda</u> was violated when Detective Street effectively recognized that the appellant had invoked his right to silence but deliberately attempted to outflank it with his ploy of **"I'M ASKING YOU THESE QUESTIONS BECAUSE WE'RE TRYING TO MOVE PAST YOU IN OUR INVESTIGATION."** Once the right to silence has been invoked, the interrogation should stop. The police do not get to ask one question more, even in an effort to **MOVE PAST THE DEFENDANT**.

In three separate manifestations, <u>Miranda</u>'s right to silence was violated in this case.

## Computing Harmless Error

How does one measure insignificance? One does not. One measures first significance. What then remains in the empty void beyond is insignificance. How then does one compute harmless error?

The State has asked us to consider the possibility that the admission by the appellant of his guilt, even if erroneously obtained in violation of his constitutional right to remain silent, was harmless error. We are not remotely inclined to do so, but the State's request

does afford us the opportunity to ruminate briefly on the fascinating riddle of harmless error. In Maryland, our reliable point of departure has long been <u>Dorsey v. State</u>, 276 Md. 638, 659, 350 A.2d 665 (1976):

> [W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that <u>the error in no way influenced the verdict</u>, such error cannot be deemed 'harmless' and a reversal is mandated. Such reviewing court must thus be satisfied that <u>there is no reasonable possibility that the evidence complained of – whether erroneously admitted or excluded – may have contributed to the rendition of the guilty verdict</u>.

(Emphasis supplied.)

The core of the State's contention is that the appellant's confession "was **CUMULATIVE** to other evidence such as the substantial contraband recovered from Soares' home and a text message appearing to show Soares confirming that he sold crack cocaine." **CUMULATIVE**? What is the significance of evidence being "**CUMULATIVE**"? And "**CUMULATIVE**" to what end? To be sure, in terms of the State's burden of production, the appellant's confession was indubitably surplusage, and, therefore, "**CUMULATIVE**." That, however, tells us absolutely nothing about harmless error.

In addressing harmless error, an appellate court engages in the unusual task of attempting to measure insignificance. At what point is something so insignificant as to be devoid of any meaningful significance? Do we take our measurement, moreover, along the continuum of production, as a matter of law, or along the continuum of persuasion, as a matter fact? The fatal flaw in the State's argument is to conflate those two continua.

Reliance on the **CUMULATIVE** status of the evidence is a common mistake of the State when urging a finding of harmless error. To say that the confession was not needed

23

to get to the jury is not, of course, to say that it was not of value in persuading the jury. To be cumulative can be a very effective means of being persuasive. In persuading the jury, cumulative evidence can be a good thing. A drumbeat of repetition can be a convincingly effective trope. The State chronically, however, seeks to assess harmless error by treating its remaining case, after subtracting the error, as a production issue rather than as a persuasion issue. It thereby sets the bar far too low.

The State devalues the appellant's confession as "cumulative." Cumulative evidence, of course, may be of absolutely no value for the minimal task of proving a prima facie case and avoiding an adverse judgment of acquittal. It may, by stark contrast, be of extreme, nay indispensable, value in persuading twelve timorous and cautious "doubting Thomases" to assert a definite conclusion unanimously and beyond a reasonable doubt. At what point then does "more" become "surplus"? In a word, at what point is the accumulation of proof of guilt **ENOUGH?** That depends, of course, on which continuum we are standing as we measure. On the production continuum, it is **ENOUGH** when the beleaguered prosecutor can grudgingly say to himself, "Well, at least this case will go to the jury." On the persuasion continuum, by contrast, it may not be **ENOUGH** until even the more cautious prosecutor can comfortably say to himself, "This case is in the bank. Anything beyond this point will simply be gilding the lily." The two **ENOUGHS** are miles apart and only beyond the more distant of the two **ENOUGHS** is error harmless.

The assessment of harmless error is, moreover, a multi-factored exercise. In measuring whether the jury was influenced by the tainted evidence, an indispensable factor is whether the jury paid any attention to the evidence. Did the evidence in question make a

24

grand entrance on center stage, perhaps with the fanfare of a ruling on contested admissibility, or did it slip in inadvertently, albeit erroneously, from the wings? Was the admission of the evidence the culmination of a fierce legal struggle over admissibility or, as happens not infrequently, did it end up in the case almost by accident or inadvertently? In essence, to what extent were jurors paying close attention? Once on stage, was it then used and exploited by the State or did it sit, neglected, in a quiet corner? If the State, in jury argument, uses the tainted evidence in its effort to influence the jury, it is hard for the State later to claim that the evidence was incapable of influencing the jury.

As an appellate court engages in the assessment of harmless error, moreover, there is inevitably a qualitative, indeed almost an artistic, component that enters into the measuring process. As the prosecution's burden shifts from one of production to one of persuasion, the inquiry "How much is **ENOUGH**?" shifts from being an arithmetic question to a less quantifiable question of forensic art. Does the additional evidence produce in the theretofore undecided factfinder a discernible sigh of relief or does it produce simply a yawn? That difference is qualitative.

In terms of its acclaim, moreover, the evidence is not always dependent on the use the State seeks to make of it. Some evidence is capable of speaking for itself. Michelangelo's David and the Mona Lisa can generate their own acclaim without the benefit of lawyerly touting. The erroneously admitted evidence being subjected to harmless error review generally tends to be of a peripheral or tangential nature. It is rarely, as in this case, the "smoking gun." In a purely mathematical sense, that would not make a bit of difference – but subjectively it can make a lot of difference. When history writes up its

25

story of the case, what will be the artistic highlights? An artistic highlight could hardly be dismissed as having been harmless. In assessing harmless error, the verb "influence" and the noun "impact" are concepts worthy of conscious consideration. When measuring not the weight of the evidence in a vacuum chamber but the impact of the error on a lay jury, one may not blithely discount the sex appeal of the tainted evidence. We measure not what **SHOULD** influence or have an impact on a jury but what **MAY** influence or have an impact on a jury. Our focus is not simply on the evidence per se but on the jurors per se. The focus may, indeed, be on the meekest and least resolute of them. In their infinite variety, jurors are less predictably persuadable than are accountants.

The State in this case does not meet that stern and demanding test for forgiving its error. The State, of course, has the burden of proof. The case against the appellant, albeit legally unimpeachable, was largely circumstantial. Contraband drugs were found in the appellant's house. The appellant was one of the two owners and residents of that house. **ERGO…?** Notwithstanding that permissive (and, indeed, highly likely) inference from the circumstantial case that may have saved this case from a directed verdict of acquittal, the indisputable "smoking gun" was still the appellant's spontaneous and emotionally charged confession of solitary guilt when the police even suggested his wife's possible complicity. The impact was more than quantitative. The very tone of the confession and the context that triggered it enriched it with poignant credibility. We cannot and we do not discount the appellant's confession as having had neither influence nor impact on the final verdict. The spontaneous and impassioned confession here was not peripheral surplusage. It was a persuasive bombshell.

**JUDGMENT REVERSED AND CASE REMANDED FOR FURTHER PROCEEDINGS; COSTS TO BE PAID BY MONTGOMERY COUNTY.**